# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BLAKE H. CONYERS,

                  Plaintiff,

          -vs-                            Case No.   01-C-1109

TOM ABITZ, KEITH HELLWIG,
LORA HALLET, WARDEN MARIANNE COOKE,
BARBARA L. EARLE, STEVEN HAFERMANN,
PAUL ZOSCHKE, THOMAS J. NICKEL,
WARDEN KENNETH J. SONDALLE,
CHARLES MILLER, AVE M. BIE, and
MICHAEL J. SULLIVAN,

                  Defendants.

## DECISION AND ORDER

           Plaintiff Blake H. Conyers, a former Wisconsin state prisoner who is currently incarcerated at the Lawrence Correctional Center in Sumner, Illinois, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Before the court are the defendants' motion for summary judgment and the plaintiff's cross-motion for summary judgment.

## BACKGROUND OF THE CASE

          The complaint, filed on October 31, 2001, states the three following claims: 1) denial of procedural due process; 2) Fourth Amendment unreasonable search based on allegations that the plaintiff was forced to submit to a random pat search upon leaving the

Kettle Moraine Correctional Institution chapel; and 3) a First Amendment claim based on allegations that the plaintiff's request to participate in the 1996 Fast of Ramadan was denied. On March 21, 2003, pursuant to the defendants' motion to dismiss, the court dismissed the plaintiff's procedural due process claim and also dismissed his claims for injunctive and declaratory relief since the plaintiff is incarcerated in an out-of-state prison and cannot demonstrate that he is likely to ever again be incarcerated in a Wisconsin prison.

The defendants subsequently filed a motion for summary judgment arguing that the plaintiff failed to exhaust administrative remedies as to his remaining Fourth and First Amendment claims. On February 26, 2004, the court issued a Decision and Order granting the defendants' motion. Judgment was entered dismissing this action on February 26, 2004. The plaintiff appealed.

On July 25, 2005, the Seventh Circuit Court of Appeals decided *Conyers v. Abitz*, 416 F.3d 580, affirming in part, vacating, and remanding in part this court's February 26, 2004 Decision and Order. The appeals court affirmed the dismissal of the plaintiff's Fourth Amendment claim. *Id.* at 584. As to the First Amendment claim, this court's decision that the plaintiff failed to exhaust the claim was vacated, and the court of appeals held that the plaintiff did exhaust his administrative remedies because the "record reveals that the grievance was principally rejected on the merits with an ambiguous secondary observation that it was untimely." *Id.* at 585; *see also Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir.

2

2004) (if prison officials choose to consider the merits of an untimely grievance, then the claim has been exhausted).

Next, the court of appeals considered the defendants' argument that dismissal of the First Amendment claim was sustainable on other grounds, and held that it was not because the defendants' summary judgment evidence was too poorly developed to support a decision in their favor. *Conyers*, 416 F.3d at 585. The appeals court also held that the defendants' evidence was insufficient to conclude that they were entitled to qualified immunity. *Id.* at 586.

The case is back before this court on the First Amendment claim. In addition, the court will address the plaintiff's state law claims. *See Conyers*, 416 F.3d at 585. On February 2, 2006, the defendants filed a motion for summary judgment. On March 2, 2006, the plaintiff filed a cross-motion for summary judgment. These motions are ready for resolution and will be addressed herein.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the

3

applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable

4

inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. *See* 10A Charles Alan Wright, et al. § 2720 at 327-28 (3d ed. 1998). I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir. 1957). Cross motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and additional evidence may be adduced at trial which would be helpful in the disposition of the case. *See M. Snower & Co. v. United States*, 140 F.2d 367 (7th Cir. 1944). Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Charles Alan Wright, et al. § 2720 at 335.

## FACTS

### 1. Introduction

Both parties have submitted proposed findings of fact along with their motions for summary judgment. In this section, the defendants' proposed facts are set out first, followed by the plaintiff's proposed facts. In addition, disputes are set out in footnotes corresponding to the disputed proposed fact. Factual disputes will be further addressed in the Analysis section of this Decision and Order.

### 2. Defendants' Proposed Findings of Fact

Defendant Paul Zoschke was employed by the Wisconsin Department of Corrections (DOC) as Chaplain at Kettle Moraine Correctional Institution (KMCI), located in Plymouth, Wisconsin from August 1986 until his retirement in September 2002. (DPFOF ¶ 1.) Prior to his retirement, Zoschke was employed by the State of Wisconsin since 1976. *Id.* As Chaplain at KMCI, Zoschke's duties included the following: coordinating all pastoral visits, making weekly cell front rounds to talk to inmates, filling requests for religious library loans from inmates, responding to inmate interview requests, and processing inmate requests for religious material from outside the institution. (DPFOF ¶ 2.)

On December 14, 1995, the plaintiff was sentenced to 90 days program segregation, arising from Conduct Report # 718333, and was housed in the Adjustment Center at KMCI. (DPFOF ¶ 3.)

Case 2:01-cv-01109-RTR   Filed 10/27/06   Page 6 of 29   Document 110

Inmates who choose to participate in the Fast of Ramadan generally fast from sunrise to sunset. (DPFOF ¶ 4.) Inmates who participate are provided with their breakfasts prior to sunrise and are given a "brown bag" meal after sunset in order to break their fasts. *Id.* The start date for the Fast of Ramadan changes annually. (DPFOF ¶ 5.) Staff at DOC Central Office customarily sends notice of the Ramadan start date to all chaplains employed by the DOC. *Id.*

Approximately thirty days before the Ramadan start date, it was defendant Zoschke's standard practice to draft a notice in the daily bulletin, which was distributed to all inmates housed in general population, indicating the deadline for signing up to participate in the Fast of Ramadan. (DPFOF ¶ 6.) In addition, Zoschke would make an announcement at the Friday prayer service that inmates interested in participating in the Fast of Ramadan should sign up by the deadline date. *Id.* Inmates in segregation were aware that bulletins were not posted in the Adjustment Center. *Id.*

For the time relevant to this matter, the Fast of Ramadan began on January 22, 1996. (DPFOF ¶ 7.) The deadline to sign up for the Fast of Ramadan was usually five to seven days before the start of the Fast to allow institution staff to prepare for the event. (DPFOF ¶ 8.)[1]

---

[1] The plaintiff disputes DPFOF ¶ 8. According to the plaintiff, bulletin notices and deadline sign-up dates created by defendant Zoschke applied only to all Muslims housed in the KMCI general population, and are immaterial or otherwise irrelevant to inmates in the Adjustment Center wishing to participate in the 1996 Fast of Ramadan. (Conyers Aff. ¶¶ 4-7, 9, and 22.)

When inmates enter KMCI, they are given an inmate handbook informing them that inmates who are interested in participating in any of the religious programs should submit an interview request to the Chaplain. (DPFOF ¶ 9.) Pursuant to KMCI Policy and Procedure Number 875-5.DOC, Religious Services, inmates were responsible for submitting requests to participate in special religious services by interview request or personal conversation with the chaplain and to follow the rules of participation. (DPFOF ¶ 10.) The bulletin notice was considered a courtesy for inmates. (DPFOF ¶ 11.) Inmates were expected to know when their religious observances began and ended; staff were not responsible for ensuring that every inmate was aware of the dates of particular religious holidays that they may observe. *Id.*[2]

Although the bulletin notice was a courtesy, in order to ensure that the Muslim inmates housed in segregation were aware of the Fast of Ramadan start date, defendant Zoschke would contact the sergeant working in the Segregation Unit and have him poll the inmates as to their desire to participate. (DPFOF ¶ 12.) The sergeant would then report back to Zoschke regarding the resulting number of participants. *Id.* Zoschke assumed that the plaintiff had been polled by the sergeant while he was housed in the Adjustment Center and,

---

[2] The plaintiff disputes DPFOF ¶ 11. See response to DPFOF Number 8, and Conyers Aff. ¶¶ 16-17, Ex. 1, and ¶¶ 21,23. Defendants Zoschke, Earle, Cooke, Haferman and Sondalle were responsible for ensuring that inmates in the Adjustment Center, including the plaintiff, were aware of the annual dates that they may observe the Ramadan Fast. *Id.*

8

since the sergeant did not report that the plaintiff desired to participate, Zoschke assumed the plaintiff did not desire to participate. *Id.*[3]

In addition, inmates were also allowed to submit timely written Interview/Information Requests to Zoschke indicating their desire to participate in the Fast of Ramadan, the Segregation Unit sergeant would forward any written interview requests he received from inmates who were requesting to participate in the Fast of Ramadan. (DPFOF ¶ 13.) The plaintiff did not submit a timely written request to Zoschke. *Id.*[4]

Defendant Zoschke also made weekly rounds in the Adjustment Center to talk to inmates at their cell fronts. (DPFOF ¶ 14.) While at their cell front, an inmate would have the opportunity to talk to Zoschke regarding any questions or concerns he may have and could also make an oral request to participate in group activities to Zoschke. *Id.* The plaintiff did not make an oral request to Zoschke to participate in the Fast of Ramadan. *Id.*[5]

---

[3] The plaintiff disputes DPFOF ¶ 12. The plaintiff was never polled by anyone regarding his desire to participate in the 1996 Fast of Ramadan while he was housed in the Adjustment Center. Pursuant to KMCI Policy and Procedure Number 875-5.DOC, it was defendant Zoschke's responsibility to promote and inform the plaintiff of the Ramadan Fast while the plaintiff was in the Adjustment Center, but defendant Zoschke failed to do so. (Conyers Aff. ¶¶ 9, 20.)

[4] The plaintiff disputes DPFOF ¶ 13 insofar as the defendants allege that inmates were allowed to submit only "timely" written interview requests to defendant Zoschke indicating their desire to participate in the Fast, and that the plaintiff "did not submit a timely written request" to defendant Zoschke while in the Adjustment Center. (Conyers Aff. ¶¶ 6, 8.)

[5] The plaintiff disputes DPFOF ¶ 14 on the ground that the allegations therein are false and based on the sworn affidavit of Defendant Zoschke which was made in bad faith. It was impossible for the plaintiff to make "an oral request to Zoschke" due to the fact that Zoschke did not make any cell front rounds in the Adjustment Center to talk to the plaintiff about his desire to participate in the 1996 Fast of Ramadan either prior to or after the sign-up deadline notice that Zoschke had drafted in the Daily Bulletins. (Conyers Aff. ¶¶ 9-10, 22; Defs.' Resp. to Pl.'s First Req. for Admis. No. 7.)

9

Inmates who requested to participate in the Fast of Ramadan after the sign-up deadline had passed were not allowed to participate due to the fact that Food Service staff had to be given advance notice as to the number of bag meals they needed to prepare for the religious observance.  (DPFOF ¶ 15.)  In addition, unit staff had to be given a list of participating inmates in advance so appropriate preparations could be made. *Id.*[6]  If a request to participate in the Fast of Ramadan was received late, Zoschke would send a note back to the inmate explaining that the deadline date to sign up had passed.  (DPFOF ¶ 16.)  If an inmate was transferred from another institution and wished to participate in the Fast of Ramadan, he needed to make a request to participate and Zoschke would then verify with the chaplain from the inmate's previous institution as to whether that inmate had made a timely request to participate.  (DPFOF ¶ 17.)[7]

On or around January 20, 1996, three days after the sign-up deadline, the plaintiff, for the first time as far as Zoschke knew, requested to participate in the Fast of Ramadan.  (DPFOF ¶ 18.)  The plaintiff did not indicate that he had not been informed about

---

[6] The plaintiff disputes DPFOF ¶ 15.  (See Response to DPFOF ¶ 8; Conyers Aff. ¶ 13.)

[7] The plaintiff disputes DPFOF ¶ 17 insofar as it alleges that Zoschke would verify whether an inmate transferred from another prison wishing to participate in the Fast of Ramadan had made "a timely request to participate" at the previous institution.  Defendants Zoschke, Earle, and Cooke were willing to accommodate Muslim inmates transferred to KMCI from other institutions only if they had complied with the rules for requesting and signing up for the Fast and had been allowed to participate at the previous institution.  Neither the KMCI or DOC rules and regulations mandated that inmates wishing to participate in any religious program or special religious services were required to submit a "timely request" to the chaplain at any adult facility in order to be granted to participate.  (See Conyers Aff. ¶¶ 5-6; DRFRFA No. 18.)

Case 2:01-cv-01109-RTR   Filed 10/27/06   Page 10 of 29   Document 110

the sign-up deadline in time to make a timely request. *Id.*[8] On January 22, 1996, Zoschke responded to the plaintiff's tardy request to participate in the Fast of Ramadan. (DPFOF ¶ 19.) Zoschke informed him that the due date for signing up for the 1996 Fast of Ramadan was January 17, 1996. *Id.*[9]

It has been Zoschke's experience that devout Muslims were generally aware of the annual dates of Ramadan. (DPFOF ¶ 20.) If they were not aware of the exact dates, but had a genuine desire to participate, they tended to make timely inquiries and requests to participate. *Id.*[10] To Zoschke's recollection, the plaintiff was not very active in the Islamic group. (DPFOF ¶ 21.) The plaintiff did not actively participate in Islamic group activities and events. *Id.*[11]

---

[8] The plaintiff disputes DPFOF ¶ 18 insofar as it alleges that the plaintiff requested to participate in the Fast of Ramadan "three days after the sign-up deadline." (See Zoschke Aff., Ex. C; response to DPFOF ¶ 8.)

[9] The plaintiff disputes DPFOF ¶ 19 insofar as it alleges that the plaintiff's request was "tardy" and that Zoschke informed the plaintiff that the due date for signing up for the 1996 Fast of Ramadan was "January 17, 1996." (See response to DPFOF ¶ 18; Conyers Aff.¶ 8.)

[10] The plaintiff disputes DPFOF ¶ 20. Noone can say that all devout Muslims at KMCI were aware of the annual dates that the prison would allow them to begin the Ramadan Fast. The inclusive date of the Ramadan Fast is determined by the DAI pursuant to DOC 309 IMP #6-G (A)(4), and notice of the Ramadan start date is sent to Zoschke from such staff at DOC Central Office. (Conyers Aff. ¶¶ 21-23.)

[11] The plaintiff disputes DPFOF ¶ 21. As a sincere Muslim and believer in the Islamic faith, the plaintiff participated in virtually all of the Islamic group activities and events that KMCI had to offer Muslims while he was in the general population of that prison. The plaintiff participated in the 1995 Fast of Ramadan at KMCI, and he would appear at the KMCI chapel to worship his Islamic faith on each Friday as scheduled. Defendant Zoschke should easily be able to recall the fact that on each Holy day (Friday), many Muslims, including the plaintiff, would complain to Zoschke about them being required to hold their religious servies in the basement of the chapel, and about how disrespectful Zoschke was by filling the small and crammed up space with his pungent cigar-pipe smoke while the plaintiff and the other Muslims worshiped. (Conyers Aff. ¶¶ 2-3.)

11

The deadline to sign up for the Fast of Ramadan is set because religious fasts or feasts requires additional work for Food Service staff. Typically there is a need to plan out how much supplies are needed to meet the needs of the inmates participating, and to prepare the meal bag separately from the regular meal service. (DPFOF ¶ 22.) Arrangement for the fast must be made and coordinated by staff, and notification of inmates approved to participate must be sent out to the units to ensure that each shift will have knowledge of which inmates are to be served separate from the regular meal service. *Id.*[12]

Inmates at KMCI are expected to abide by all rules and regulations and to meet all applicable deadlines. (DPFOF ¶ 23.) They are expected to accept personal responsibility for their behavior. The purpose of the rules, regulations, and deadlines is to encourage inmates to take responsibility for their actions and to promote their rehabilitation. *Id.* Observing deadlines is important to the rehabilitation of inmates to help them to become functional and productive members of society upon release. *Id.* Rules, regulations, and deadlines are also necessary to maintain the security, order, and safety in the institution. *Id.* If an inmate was to violate institution rules without consequence, other inmates would be inclined to behave similarly, thereby placing the security and order of the institution in jeopardy. *Id.*[13]

---

[12] The plaintiff disputes DPFOF ¶ 22. (See response to DPFOF ¶ 8; Conyers Aff. ¶ 13.)

[13] The plaintiff disputes DPFOF ¶ 23. (See response to DPFOF ¶ 8; Conyers Aff. ¶¶ 20, 24.)

Betty Kruse is an adult resident of the County of Dane, State of Wisconsin. (DPFOF ¶ 24.)  Kruse is employed by the State of Wisconsin Department of Justice as a paralegal assigned to the Civil Litigation Unit, Legal Services Division.  (DPFOF ¶ 25.)  As a paralegal, Kruse's duties include receiving, filing, and keeping a record of notices of claim required to be filed with the Attorney General pursuant to Wis. Stat. § 983.82.  (DPFOF ¶ 26.)  Kruse has searched her records concerning the service of notices of claim on the Attorney General and the copies of the notices of claim served upon the Attorney General and state, based upon such examination of records, that on April 1, 1997, the plaintiff served by certified mail a notice of claim, which is at issue in the present action.  (DPFOF ¶ 27.)

**3. Plaintiff's Proposed Findings of Fact**

As a sincere Muslim and believer in the Islamic faith, the plaintiff participated in virtually all of the Islamic group activities and events that KMCI had for Muslims while he was within the general population of that prison as a Wisconsin inmate.  (PPFOF ¶ 1.) The plaintiff participated in the 1995 Fast of Ramadan at KMCI, and he would appear at the KMCI chapel to worship his Islamic faith on each Friday as scheduled.  *Id.*[14]

Daily Bulletin notices and deadline sign-up dates created by defendant Zoschke regarding inmates interested in participating in the 1996 Fast of Ramadan applied only to all

---

[14]  The defendants dispute PPFOF ¶ 1.  To defendant Zoschke's recollection, the plaintiff was not very active in the Islamic group.  The plaintiff did not actively participate in Islamic group activities and events.  (DPFOF ¶ 21; Supp. Zoschke Aff. ¶ 26.)

Case 2:01-cv-01109-RTR   Filed 10/27/06   Page 13 of 29   Document 110

Muslims housed in the KMCI general population, and did not apply to Muslims such as the plaintiff who were in the Adjustment Center. (PPFOF ¶ 2.)[15]

On December 14, 1995, the plaintiff was sentenced to 90 days program segregation time, which he served in the Adjustment Center, as a result of Conduct Report #718333. (PPFOF ¶ 3.) On January 22, 1996, the day that the Fast of Ramadan began, defendant Zoschke, in a written response, cited the bulletin notices of January 4, 9, 11, and 16, 1996 as a basis for denying the plaintiff's January 20, 1996 written interview request to participate in the Fast of Ramadan and to be provided bagged dinners while serving time in the Adjustment Center. (PPFOF ¶ 4.)

Pursuant to KMCI Policy and Procedure Number 875-5.DOC(D)(7), it was defendant Zoschke's responsibility to promote and inform the plaintiff of the 1996 Fast of Ramadan while he was in the Adjustment Center, but Zoschke failed to do so. (PPFOF ¶ 5.)[16] Defendant Zoschke did not make any cell front rounds in the Adjustment Center to talk to the plaintiff about his desire to participate in the 1996 Fast of Ramadan either prior to or after the sign-up deadline notice that Zoschke had drafted in the Daily Bulletins. (PPFOF ¶ 6.)[17] After receiving defendant Zoschke's January 22, 1996 written denial, the plaintiff saw

---

[15] The defendants dispute PPFOF ¶ 2. Inmates in the Adjustment Center are verbally notified of notices of general applicability. Zoschke also made announcements at the prayer services and made weekly rounds at the cell fronts of the inmates in the Adjustment Center. (DPFOF ¶¶ 6, 12, 14; Supp. Zoshcke Aff. ¶¶ 10, 17, 19.)

[16] The defendants dispute that defendant Zoschke failed to promote and inform the plaintiff of the 1996 Fast of Ramadan while the plaintiff was in the Adjustment Center. (DPFOF ¶¶ 6, 12, 14; Supp. Zoschke Aff. ¶¶ 10, 17, 19.)

[17] The defendants dispute PPFOF ¶ 6. Defendant Zoschke made weekly rounds in the Adjustment Center to talk to inmates at their cell fronts. (DPFOF ¶ 14; Supp. Zoschke Aff. ¶ 19.)

14

defendant Earle as she was making her cell front rounds in the Adjustment Center, and the plaintiff asked her to put him on the Ramadan list so that he could participate in the Fast and receive proper meals while complying with his religious observance. (PPFOF ¶ 7.) However, defendant Earle told the plaintiff that she was not going to go over the decision made by Zoschke, and then she left from the plaintiff's cell. *Id.* Defendant Earle had the authority to override defendant Zoschke's decision in denying the plaintiff's request to participate in the 1996 Fast of Ramadan. (PPFOF ¶ 8.) Pursuant to Wis. Admin. Code §§ DOC 309.37(4)[18] and DOC 309.61(7)(b)[19], defendants Zoschke and Earle were required to ensure that the plaintiff was provided a special diet so that he could comply with the dietary restrictions prescribed by his Islamic religion during the month of Ramadan. (PPFOF ¶ 9.) Defendants Zoschke and Earle did not make any attempt to ensure that the plaintiff was provided special meal accommodations to participate in the 1996 Fast of Ramadan. (PPFOF ¶ 10.)[20] Pursuant to KMCI rule, inmates housed in the Adjustment Center were prohibited

---

[18]     (4) Consistent with available resources, inmates who require a special diet for medical or religious reasons shall be provided with such a diet.

Wis. Admin. Code § DOC 309.37(4).

[19]     (b) To the extent feasible, institutions shall plan meals so that an inmate may maintain a nutritious diet while complying with dietary restrictions prescribed by the inmate's religion.

Wis. Admin. Code § DOC 309.61(7)(b).

[20] The defendants dispute PPFOF ¶ 10. To ensure the plaintiff was provided accommodations to participate in the 1996 Fast of Ramadan, defendant Zoschke contacted the sergeant working in the Segregation Unit and had him poll the inmates as to their desire to participate. Defendant Zoschke also made announcements at the prayer service and made weekly rounds in the Adjustment Center to talk to inmates at their cell fronts. Inmates were also allowed to submit timely written Interview/Information Requests to defendant Zoschke indicating their desire to participate in the Fast of Ramadan. (DPFOF ¶¶ 6, 12-14; Supp. Zoschke Aff. ¶¶ 11, 17-19.)

from saving or keeping meals in their cells that were issued during regular meal times. (PPFOF ¶ 11.)

Wisconsin Administrative Code § DOC 303.08(2) states:

> (2) Each institution shall maintain at least one bulletin board for bulletins of general applicability. Bulletin boards shall be so located that every inmate has an opportunity to read all bulletins which apply to him or her. Additional bulletin boards should be maintained in workshops, classrooms, recreation areas, housing units, or other places for the posting of notices which apply only to inmates who use the particular facility involved. Each inmate at a maximum security institution shall be given a copy of all bulletins which are applicable to him or her.

(PPFOF ¶ 12.) Upon the plaintiff's placement in the Adjustment Center, defendant Haferman was made aware of the plaintiff's Islamic beliefs and ensured that he was served non-pork meals during his confinement therein. (PPFOF ¶ 13.) While confined in the Adjustment Center serving program segregation time, the plaintiff was allowed to go to the enclosed recreation area outside of his cell almost each day, and he was allowed to take showers as scheduled. (PPFOF ¶ 14.) Defendants Zoschke, Earle, Hafermann, Cooke, and Sondalle did not ensure that bulletins regarding the 1996 Fast of Ramadan, or any other bulletin notice, were posted in the Adjustment Center for the plaintiff and other inmates therein to have an opportunity to read while en route to the recreation area or showers. (PPFOF ¶ 15.)

The above failure of the Defendants Zoschke, Earle, Hafermann, Cooke, and Sondalle has caused the plaintiff to suffer irreparable hardship, physically, emotionally, and

16

spiritually, and was in violation of departmental rules, policies, procedures, as well the plaintiff's free exercise rights to the First Amendment to the United States Constitution. (PPFOF ¶ 16.)[21]

While in the Adjustment Center, the plaintiff's only responsibility in participating in the Fast of Ramadan was to request to participate by way of written interview request to defendant Zoschke. The plaintiff did this since Zoschke never made cell front rounds nor promoted or personally informed the plaintiff of the Ramadan Fast as Zoschke was required to do. (PPFOF ¶ 17.)[22] Since the bulletin notice established by defendant Zoschke regarding the Ramadan Fast was posted in the general population and set forth guidelines governing such participation, defendants Earle and Cooke were responsible for ensuring that those guidelines were "posted in a conspicuous place or distributed to all inmates," including the Adjustment Center or to inmates therein, just as defendants Hafermann, Zoschke, and Sondalle were responsible for ensuring that inmates in the Adjustment Center, including the plaintiff, had an opportunity to read those bulletin notices pertaining to the 1996 Fast of Ramadan and otherwise be personally informed by Chaplain Zoschke of that Fast, because Wis. Admin. Code §§ DOC 303.08(2) and DOC 309.61(g),

---

[21] The defendants dispute PPFOF ¶ 16. They state that the plaintiff's assertion is conclusory, argumentative, and asserts a conclusion of law, and should be disregarded by the court. Further, PPFOF ¶ 16 does not assert a material fact and therefore any dispute is irrelevant.

[22] The defendants dispute PPFOF ¶ 17. Inmates in segregation were polled by the sergeant, inmates were allowed to submit timely written Interview/Information Requests, and defendant Zoschke promoted the Fast of Ramadan by announcement at the prayer services and also weekly rounds in the Adjustment Center to talk to inmates at their cell fronts. (DPFOF ¶¶ 12-14; Supp. Zoschke Aff. ¶¶ 17-19.)

17

KMCI Policies and Procedures Number 875-5.DOC(D)(7) make no exception. (PPFOF ¶ 18.)[23]

      There would not have been a breach of the security or order at KMCI in providing the plaintiff with the requested meals so that he could comply with his dietary restrictions prescribed by his Islamic faith, simply because he was unaware of the sign-up deadline, was never polled, and was unable to read the bulletin notices posted in the general population regarding the Fast of Ramadan while confined in the Adjustment Center. (PPFOF ¶ 19.)[24] Because of the fact that the plaintiff was denied to participate in the 1996 Fast of Ramadan while in the Adjustment Center, defendants Zoschke and Earle made no exception for the plaintiff to even participate in the Feast of Eid-ul-Fitr after the plaintiff was released from segregation and requested same. (PPFOF ¶ 20.)

      Pursuant to Wis. Admin. Code § DOC 309.61(1)(a), the Department recognized that religious beliefs can provide support to inmates which may aid in their adjustment to institutional life and can lead to the development of community ties which may aid in the inmates' successful reintegration into the community upon release. (PPFOF ¶ 21.) However, the acts and omissions of defendants Zoschke, Earle, Hafermann, Sondalle, and

---

[23] The defendants dispute PPFOF ¶ 18. The state that the plaintiff's assertion is conclusory, argumentative, and asserts a conclusion of law, and should be disregarded by the court. Further PPFOF ¶ 18 does not assert a material fact and therefore any dispute is irrelevant.

[24] The defendants dispute PPFOF ¶ 19. Unit staff had to be given a list of participating inmates in advance so appropriate preparations could be made with the additional workload for Food Service staff. (DPFOF ¶¶ 15, 22; Supp. Zoschke Aff. ¶¶ 20, 27.)

Cooke which led to the plaintiff being denied participation in the 1996 Ramadan Fast and provided special meals so that he could be in compliance with his Islamic dietary restrictions, deprived the plaintiff of his right to enjoy the same spiritual experience as Muslims over the world. *Id.*[25]

## ANALYSIS

**1. First Amendment Claim**

  The defendants make two contentions. They allege that they did not violate Conyers's First Amendment right because Conyers only informed Zoschke of his desire to participate in the Fast of Ramadan after the sign-up deadline. Furthermore, the defendants allege that Conyers failed to inform Zoschke that Conyers had not been made aware of the deadline. On the other hand, Conyers argues that the sign-up deadline did not apply to him, that he was never informed of the deadline, and there is no penological interest in enforcing the deadline.

  As a prisoner, the plaintiff retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the correctional system. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Encompassed within the First Amendment is the right of free exercise of religion. *O'Lone v. Estate of Shabazz*, 482

---

[25] The defendants dispute PPFOF ¶ 21. They state that the plaintiff's assertion is conclusory, argumentative, and asserts a conclusion of law, and should be disregarded by the court. Further PPFOF ¶ 21 does not assert a material fact and therefore any dispute is irrelevant.

19

U.S. 342, 348 (1987); *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992); *Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005).

A prisoner is entitled to practice his or her religion as long as doing so does not unduly burden the institution. *Richards*, 957 F.2d at 474. A prison regulation that infringes upon an inmate's First Amendment rights is valid only "if it is reasonably related to legitimate penological interests." *Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir. 1994) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). In balancing the two interests, several factors are relevant: 1) whether there is a legitimate governmental interest underlying the prison officials' actions; 2) whether the prisoner retains alternative ways of exercising the right in question; and 3) the impact accommodation of the asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources. *Richards*, 957 F.2d at 471 (citing *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991)).

However, if the plaintiff is not a sincere Muslim, he must lose on his free exercise claim. *See Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988). Although the defendants do not specifically argue that the plaintiff's religious beliefs are insincere, Zoschke does aver that, to his recollection, the plaintiff was not very active in the Islamic group and did not actively participate in Islamic group activities. (Zoschke Aff. ¶ 22; DPFOF ¶ 21.) If Conyers was not active in practicing his Islamic faith, then that would be evidence of his insincerity. *See Reed*, 842 F.2d at 963. Conyers disputes Zoschke's averment by asserting that he is a sincere believer of the Islamic faith and has participated in virtually all

of the Islamic group activities and events offered by KMCI. (Conyers Aff. ¶¶ 2-3; PPFOF ¶ 1.) Conyers also claims that he participated in the 1995 Fast of Ramadan and that he appeared at the KMCI chapel to worship each Friday as scheduled. *Id.* This dispute concerning the sincerity of Conyers's religious beliefs is a genuine issue of material fact because a reasonable jury could conclude that Conyers was not a sincere Muslim at the time of the alleged violation, which would lead to a verdict in favor of the defendants.

Assuming that Conyers's religious beliefs were sincere, denying an inmate the opportunity to participate in the Fast of Ramadan impinges his constitutional right to freely exercise his religion. The Seventh Circuit has held, in the context of Muslim inmates who were denied pork-free meals while confined in disciplinary segregation, that prison officials must demonstrate a legitimate penological objective for decisions that impede religious exercise. *Conyers*, 416 F.3d at 586 (citing *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990)). Indeed, courts have generally held that to deny prison inmates the provision of food that satisfies the dictates of their faith unconstitutionally burdens their free exercise rights. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004) (noting that this principle was established in the Second Circuit in 1975); *see also Makin v. Colo. Dep't of Corrs.*, 183 F.3d 1205 (10th Cir. 1999) (holding that prison officials' failure to accommodate inmate's meal requirements during Ramadan violated his free exercise rights); *DeHart v. Horn*, 227 F.3d 47 (3d Cir. 2000) (en banc) (finding that Buddhist plaintiff whose request for a vegetarian diet was denied because vegetarianism was not an absolute requirement of Buddhism had

21

state a free exercise claim, and remanding for further factual findings regarding the existence of countervailing penological interests); *Love v. Reed*, 216 F.3d 682 (8th Cir. 2000) (holding that denial of inmate's request for bread and peanut butter so that he could prepare his Sunday meals in his cell on Saturday-thereby avoiding preparing food, or benefitting from the preparation of food by others, on the Sabbath-violated prisoner's free exercise rights); *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997) (holding that prison's policy of supplying Orthodox Jewish inmates with one frozen kosher dinner supplemented with nonkosher vegetarian or nonpork meals violated prisoners' free exercise rights).

The critical question, therefore, is whether the denial of Conyers's special meal times during Ramadan was pursuant to a sign-up deadline reasonably related to the legitimate penological objectives of rehabilitation, security, and order. Yet, before addressing that question, Conyers argues that the sign-up deadline did not even apply to him because he was in segregation at the time. (PPFOF ¶ 2.) The defendants dispute his contention, alleging that the sign-up deadline applied to all inmates, regardless of their location. (DPFOF ¶ 8.) Whether the sign-up deadline applied to inmates who were in segregation is a genuine issue of material fact because a reasonable jury could decide that the sign-up deadline did not apply to segregated inmates. If the sign-up deadline did not apply to segregated inmates, then, regardless of whether the deadline is reasonably related to legitimate penological objectives, the defendants would have no reason for denying Conyers participation in the Ramadan fast while he was in segregation.

22

Conyers also argues that he did not know of the sign-up deadline and that there is no reason why he should have known. The defendants contend, on the other hand, that there were three ways that segregation inmates could find out about and sign up for participation in the Fast of Ramadan. First, Zoschke would have a sergeant ask segregation inmates if they wanted to participate, and then report back with the number of participants. (DPFOF ¶ 12.) Defendant Zoschke avers:

> Although the bulletin notice was a courtesy, in order to ensure that the Muslim inmates housed in segregation were aware of the Fast of Ramadan start date, I would contact the sergeant working in the Segregation Unit and have him poll the inmates as to their desire to participate. The sergeant would then report back to me regarding the resulting number of participants. I assumed that inmate Conyers had been polled by the Sergeant Unit while he was housed in the Adjustment Center and, since the sergeant did not report that inmate Conyers desired to participate, I assumed inmate Conyers did not desire to participate.

(Zoschke Aff. ¶ 13.) However, Conyers avers that he was never polled by anyone regarding his desire to participate in Ramadan. (Conyers Aff. ¶¶ 9, 20.)

Second, the defendants assert that segregation inmates were allowed to submit timely written Interview/Information Requests to Zoschke requesting to participate in Ramadan, but Conyers did not submit a timely written request. (Zoschke Aff. ¶ 14; DPFOF ¶ 13.) Conyers disputes that inmates were allowed to submit only "timely" requests. He asserts that according to KMCI rules in effect in January 1996, all that was required for an

23

inmate interested in participating in any religious program or special religious service was for the inmate to submit an interview request to the chaplain. (Conyers Aff. ¶ 6; citing Zoschke Supp. Aff., Exs. A (KMCI Inmate Handbook), B & C (Policy and Procedure No. 765-5.DOC (B)(1).))

Third, according to the defendants, Zoschke made weekly rounds in the Adjustment Center to talk to inmates at their cell fronts, at which time an inmate could make an oral request to participate in group activities; however, Conyers did not make an oral request to Zoschke to participate in Ramadan. (Zoschke Aff. ¶ 15; DPFOF ¶ 14.) Zoschke admits, though, that he did not make any cell front rounds in the Adjustment Center to talk to Conyers about his desire to participate in the 1996 Fast of Ramadan either prior to or after the sign-up deadline notice. (Defs.' Resp. to Pl.'s First Req. for Admiss. No. 7; *see also* Conyers Aff. ¶¶ 9-10, 22.)[26]

Regardless of whether this Court draws all inferences in a light most favorable to the defendants or Conyers, there is a genuine issue of material fact concerning whether Conyers was aware of the sign-up deadline. A reasonable jury could decide that Conyers either should have been aware or could have been aware of the sign-up deadline.

Even if Conyers was not aware of the sign-up deadline, the question remains whether the defendants had a legitimate penological interest supporting their decision to

---

[26] There is also a possible fourth way, which was not brought up by the defendants, that segregated inmates could be aware of the sign-up deadline for Ramadan. If Conyers had participated in the Ramadan the previous year, as Conyers contends he did, he should have been aware of the sign-up deadline with which he allegedly complied in 1995.

24

prohibit Conyers's participation in the Fast of Ramadan. *See Conyers*, 416 F.3d at 585-86. The Seventh Circuit's opinion vacating this Court's initial grant of summary judgment stated that the defendants had failed to present substantial evidence supporting their alleged penological objectives of order, security, and rehabilitation. *See id*. at 585. The core of the Seventh Circuit's reasoning was that the evidence provided by the defendants, when viewed in a light most favorable to Conyers, was not enough to prove that a reasonable jury would return a verdict in favor of the defendants. *See id*. at 585.

Nevertheless, one party's failure to satisfy its burden for summary judgment does not automatically indicate that the opposing party filing for summary judgment has met its burden. *See* 10A Charles Alan Wright, et al. § 2720 at 335. Conyers has failed to provide sufficient evidence demonstrating that the defendants lacked a penological interest by enforcing the sign-up deadline, which means that he has failed to meet his burden as well.

Accordingly, the Court must deny both the defendants' and Conyers's motions for summary judgment on the First Amendment claim.

**2. State Law Claims**

The defendants contend that since the plaintiff has alleged that he complied with Wis. Stat. § 893.82 by filing notice of claim number 970404041, his state claims are limited to those based on events occurring 120 days prior to April 1, 1997. The plaintiff contends that, 1) his underlying state claims in connection with the three inmate complaints are not limited to merely those based on events occurring within 120 days prior to April 1,

25

1997, because he had no actual knowledge of the underlying cause of action until he was served with the final decision on each of those three inmate complaints; and 2) since the defendants' actions in failing to provide the plaintiff a remedy at law for the injuries or wrongs that he sustained as a Wisconsin prisoner resulted in the defendants maliciously and/or willfully failing to perform their ministerial duties through the ICRS and deprived the plaintiff of his state law rights under the Wisconsin Constitution, the plaintiff should be granted summary judgment for the defendants' liability.

The plaintiff was never specifically allowed to proceed on any state law claims. However, the complaint does include three "Claims for Relief" that assert potential state law claims. (Compl. at 23 ¶¶ 11, 13, 13(a).) The plaintiff's brief in support of his cross-motion for summary judgment describes his state law claims as follows:

> Plaintiff asserts that the ICRS-Defendants', including Defendant Sondalle, acts and omission in the handling and processing of his inmate complaints violated his right to petition the DOC in a meaningful way and as a remedy for the wrongs asserted in those grievances [sic].

(Pl.'s Br. in Supp. of Cross-Motion for Summ. J. at 5.) According to the plaintiff, his state law claims, which are based on the handling of three of his inmate grievances (KMCI-2218-96, KMCI-2219-96, KMCI-2627-96), implicate his rights under First Amendment to the Wisconsin Constitution. The plaintiff states: "Defendants must now answer in damages for violating plaintiff's rights under the Wisconsin Constitution, with respect to him being

26

abridged from petitioning the DOC for a remedy in the laws for the wrongs stated in his grievances." *Id.*

In any civil action in which a district courts have original jurisdiction, "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . .". 28 U.S.C. § 1367(a). This section allows district courts to maintain supplemental jurisdiction over counterclaims, whether compulsory or permissive, so long as the counterclaims "are so related to" the original claims that they form the same case or controversy. *Channell v. Citicorp Nat'l Servs.*, 89 F.3d 379, 385-87 (7th Cir. 1996). A "loose factual connection between the claims" is sufficient to allow supplemental jurisdiction. *See Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995). Generally, supplemental jurisdiction is granted when "the state and federal claims derive from a common nucleus of operative facts." *Id.* (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966)).

In this case, the facts relevant to the plaintiff's First Amendment free exercise of religion claim, are not relevant to any Wisconsin Constitution First Amendment right to assemble and petition claims. The state law claims involve a different set of facts, actions, and theory of law than the § 1983 claim. Therefore, the plaintiff's state law claims will be dismissed. *See Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895 (7th Cir. 1997); *see also Wentzka v. Gellman*, 991 F.2d 423, 425 (7th Cir. 1993) ("Where a federal claim drops out

27

before trial, a district court should not retain the state claims absent extraordinary circumstances"). The defendants' motion for summary judgment as to those claims will be granted.

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #80) is **GRANTED IN PART AND DENIED IN PART.** Conyers's state law claims are dismissed, but his First Amendment claim survives.

**IT IS FURTHER ORDERED** that the plaintiff's cross-motion for summary judgment (Docket #88) is **DENIED**.

On **April 2, 2007**, at **3:00 p.m.**, the Court will initiate and conduct a final pretrial conference call. Pursuant to Civil L. R. 16.3, each party shall serve and file a final pretrial report in compliance with the Pretrial Report Order attached hereto and incorporated herein.

This case will be tried to the Court. This case will be called for trial at **9:00 a.m.** on **April 30, 2007**. The parties shall submit in writing, no later than **November 30, 2006**, the estimated length of the trial.

Dated at Milwaukee, Wisconsin, this 27th day of October, 2006.

> **SO ORDERED,**
>
> s/Rudolph T. Randa
>
> _____
>
> **HON. RUDOLPH T. RANDA**
> **Chief Judge**

28

# PRETRIAL REPORT ORDER

**IT IS ORDERED** that all parties prepare and file pretrial reports. Reports are due ten days before the scheduled start of the trial or, if a final pretrial conference is scheduled, three days before the conference. The report must be signed by the attorney (or a party personally, if not represented by counsel) who will try the case. Sanctions, which may include the dismissal of claims and defenses, may be imposed if a trial report is not filed.

The report must include the following:

1.          A short summary statement of the facts of the case and theories of liability or defense. The statement may not be longer than two pages.

2.          A statement of the issues.

3.          The names and addresses of all witnesses expected to testify. A witness not listed will not be permitted to testify absent a showing of good cause.

4.          If expert witnesses are to be used, a narrative statement of the experts' background.

5.          A list of exhibits to be offered at trial, sequentially numbered according to General L.R. 26.1.

6.          A designation of all depositions or portions of transcripts or other recordings of depositions to be read into the record or played at trial as substantive evidence. Reading or playing more than five pages from a deposition will not be permitted unless the court finds good cause.

7.          The parties' best estimate on the time needed to try the case.

8.          The proposed findings of fact and conclusions of law. (See Fed. R. Civ. P. 52).

In addition to completing a report, the parties are expected to confer and make a good faith effort to settle the case. The parties are also expected to arrive at stipulations that will save time during the trial.