# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BLAKE H. CONYERS,

                Plaintiff,

       -vs-                                                           Case No. 01-C-1109

TOM ABITZ, KEITH HELLWIG,
LORA HALLET, WARDEN MARIANNE COOKE,
BARBARA L. EARLE, PAUL ZOSCHKE,
THOMAS J. NICKEL, CHARLES MILLER,
AVE M. BIE, and MICHAEL J. SULLIVAN,

                Defendants.[1]

## DECISION AND ORDER

       Plaintiff Blake H. Conyers, a former Wisconsin state prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983. On October 27, 2006, the court granted in part and denied in part the defendants' motion for summary judgment, and denied the plaintiff's cross-motion for summary judgment.[2] Conyers' First Amendment claim, based on allegations that his request to participate in the 1996 Fast of Ramadan was denied, survives. On February 6, 2007, counsel was appointed to represent Conyers in this action. This case is scheduled for a jury trial to commence on October 4, 2007. Before the court is the defendants' motion for summary judgment.

---

[1] The defendants, according to the docket in this case, are listed above. However, according to both parties, the only remaining defendants are Marianne Cooke, Barbara Earle, and Paul Zoschke. This discrepancy is discussed *infra*.

[2] The procedural history of this case prior to October 2006 is set forth in the court's Decision and Order of October 27, 2006, at pages 1-3.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

2

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## RELEVANT UNDISPUTED FACTS[3]

Defendant Paul Zoschke ("Zoschke") was employed by the Wisconsin Department of Corrections ("DOC") as Chaplain at Kettle Moraine Correctional Institution ("KMCI"), located in Plymouth, Wisconsin from August 1986 until his retirement in September 2002. (DFOF ¶ 1; Affidavit of Paul Zoschke ("Zoschke Aff.") of 7/6/07, at ¶ 2.) As Chaplain at KMCI, Zoschke's duties included the following: coordinating all pastoral visits, making weekly cell front rounds to talk to inmates, filling requests for religious library loans from inmates, responding to inmate interview requests, and processing inmate requests for religious material from outside the institution. (DFOF ¶ 2; Zoschke Aff. of 7/6/07, at ¶ 3.) KMCI Procedure 875-5 DOC also required Zoschke to "promote and inform the inmates, staff, and volunteers of all services and activities." (PFOF ¶ 17; Hafermann Aff. of 7/9/07, Ex. B; Zoschke Aff. of 7/6/07, Ex. C.)

Steven Hafermann ("Hafermann") has been employed by the DOC as a Supervising Officer II ("Captain") at KMCI since 1994. (DFOF ¶ 3; Affidavit of Steven Hafermann ("Hafermann Aff.") 7/9/07 at ¶ 2.) In that capacity, Hafermann is responsible for maintaining the safety and security of the institution. Hafermann's duties include, but are not limited to, supervising correctional officers,

---

[3] Facts are taken from the Defendants' Proposed Findings of Fact ("DFOF"), the Plaintiff's Additional Proposed Findings of Fact ("PFOF"), and the Plaintiff's Response to the Defendants Proposed Findings of Fact ("PRDFOF"), to the extent they are undisputed.

ensuring compliance with institution security services, and developing, implementing and coordinating health and safety programs, procedures, and policies. (DFOF ¶ 4; Hafermann Aff. of 7/9/07, at ¶ 3.)

Plaintiff Blake Conyers ("Conyers") was housed at KMCI from January 12, 1993 until November 12, 1993, when he was transferred to the Columbia Correctional Institution. (DFOF ¶ 5; Zoschke Aff. of 7/6/07, at ¶ 4.) Conyers was transferred back to KMCI on June 28, 1994 until November 4, 1997, when he was released from the institution. (DFOF ¶ 6; Zoschke Aff. of 7/6/07, at ¶ 5.)

Conyers asserts that he is "a sincere Muslim and believer in the Islamic faith . . ." (Conyers Aff. of 2/21/06, at ¶ 2), and that he has participated in the Fast of Ramadan practically every year since he was twelve years old. (Conyers Dep. 15.) He is now thirty-five. (DFOF ¶ 48; Conyers Dep. at 4.)

During the month-long period of Ramadan, Muslims abstain from eating between dawn and dusk. Ramadan does not occur during a specific month or season; its timing is based on the lunar calendar and the start date moves backwards by ten or eleven days each year. In 1996 Ramadan began on January 22. (PFOF ¶ 3; Conyers Aff. of 9/2/03, at ¶¶ 15-17; Affidavit of Michael Smith, dated September 2, 2003, ¶ 15.) Inmates who chose to participate in the Fast of Ramadan generally fasted from sunrise to sunset. Those that participated were provided with their breakfasts prior to sunrise and were given a "brown bag" meal after sunset in order to break their fasts.[4] (DFOF ¶ 7; Zoschke Aff. 7/6/07, at ¶ 6.)

---

[4] Conyers disagrees with the second sentence to the extent defendants imply that all inmates who participate received a brown bag meal after sunset. Inmates who were refused permission to receive a late bagged meal could participate in the Fast of Ramadan by eating only one meal (breakfast) per day. (McKenzie Aff. Ex. A; Conyers Dep. 42:15-45:2.)

4

On December 14, 1995, Conyers was sentenced to 90 days in the adjustment center. (PFOF ¶ 1; Conyers Aff. of 9/2/03, at ¶ 16.) The adjustment center at KMCI is a maximum-security entity located within what is otherwise a medium-security facility. As a maximum-security facility, daily bulletins are not posted within the adjustment center. (PFOF ¶ 21; Defendants' Response to Plaintiff's First Set of Interrogatories, ¶ 14; Answer to Complaint ¶ 33; Complaint ¶ 64.) Inmates in segregation are confined to their cells twenty-four hours a day. As a result, they are not fed using the normal meal service in which the inmates leave their cells and eat in a large mess hall. Instead, inmates in segregation are fed by a slot in the door of the cell. (PFOF ¶ 8; McKenzie Aff., Ex. B, Zoschke Dep., 45:16-20; McKenzie Aff., Ex. A., Conyers Dep., 17:9-10, 42:24-44:22.)

If an inmate timely requested to participate in the Fast of Ramadan, Zoschke would place that inmate's name on the participation list and inform unit staff, security staff, and administrative staff (food service) of the inmates who wished to participate. (DFOF ¶ 30; Zoschke Aff. of 7/6/07, at ¶ 29.) According to Conyers, "It was standard practice for Defendant Zoschke to draft a notice in the KMCI Daily Bulletin around 30 days before the Ramadan fast, that inmates interested in participating in the Fast of Ramadan should sign-up by the deadline date. Defendant Zoschke himself created a deadline of 5-7 days before the start of the Fast to sign-up for the Fast of Ramadan."[5] (DFOF ¶ 47; Conyers Aff. of 2/21/06, at ¶ 4.)

The deadline to sign-up for participation in the Fast of Ramadan starting January 22, 1996, was set for January 17, 1996. (DFOF ¶ 15; Zoschke Aff. of 7/6/07, at ¶ 14.) Inmates in segregation were allowed to submit timely written Interview/Information Requests to Zoschke

---

[5] Conyers does not dispute this fact. However, Conyers disputes the defendants' characterization of the policy. Under this same policy, Zoschke had a duty to promote and inform the inmates of all services and activities. (7/6/07 Zoschke Aff. ¶ 3).

5

indicating their desire to participate in the 1996 Fast of Ramadan; the Segregation Unit sergeant would forward to Zoschke any written interview requests he or she received from inmates who were requesting to participate in the Fast of Ramadan.[6] (DFOF ¶ 24; Zoschke Aff. of 7/6/07, at ¶ 23.) Conyers did not submit a timely written request to Zoschke requesting to participate in the 1996 Fast of Ramadan. (DFOF ¶ 25; Zoschke Aff. of 7/6/07, at ¶ 24.) Conyers did not make an oral request to Zoschke to participate in the 1996 Fast of Ramadan. (DFOF ¶ 27; Zoschke Aff. of 7/6/07, at ¶ 26.)

KMCI's observance of Ramadan did not always coincide with the actual start date of Ramadan. Instead, KMCI's observance of Ramadan began on the day DOC mandated. (PFOF ¶ 6; McKenzie Aff., Ex. A, Conyers Dep., 15:23-16:10; McKenzie Aff., Ex. B, Zoschke Dep., 57:2-58:5.)

On or about January 20, 1996, while Conyers was serving his segregation time, he asked to be provided with late bagged dinners during the Fast of Ramadan. (DFOF ¶ 39; Zoschke Aff. of 7/6/07, at ¶ 36.) (PFOF ¶ 2; Conyers Aff. of 9/2/03, at ¶¶ 16 & 18; Zoschke Aff. of 7/6/07, at ¶ 37, Ex. C.) On January 22, 1996, Zoschke responded to Conyers' request by informing him that the due date for signing up for the Fast of Ramadan was January 17, 1996. (DFOF ¶ 40; Zoschke Aff. of 7/6/07, at ¶ 37.)

Although the January 17 sign-up deadline had been posted in the prison's daily bulletin, Conyers did not have access to that bulletin while in segregation. (PFOF ¶ 4; Conyers Aff. of 9/2/03, at ¶¶ 14 & 17, Ex. A-3.) Conyers "guessed" that Ramadan would begin in late January so he made his request on January 20, which ended up being after the deadline KMCI failed to inform Conyers

---

[6] Conyers does not dispute that this process generally was available to inmates. However, Conyers disputes the fact that this process was available to inmates in segregation in 1996 in that there was no bulletin board on which to post notices. (McKenzie Aff. Ex. B, Zoschke Dep. 63:6- 64:3.) Moreover, the record does not contain evidence that the polling of the inmates actually took place in 1996. (See Response to DFOF, ¶¶ 13 & 16; Conyers Aff. of 2/21/06, at ¶ 6.)

6

and the other inmates of.[7] (PFOF ¶ 11; McKenzie Aff., Ex. A., Conyers Dep., 20:7-21:10). No polling of the inmates in segregation occurred prior to the 1996 Ramadan observance. (PFOF ¶ 13; McKenzie Aff., Ex. A, Conyers Dep., 18:9-11).

On July 22, 1996, Conyers filed a prison grievance, complaining that because he did not have access to the daily bulletin in segregation and thus was unaware of the sign-up deadline, he had been denied the ability to participate in the Fast of Ramadan. (PFOF ¶ 5; Affidavit of Lora Hallet, Ex. 1.) Conyers' inmate complaint lists Warden Cooke as someone with information about his complaint. The inmate complaint alleges that Conyers' right to observe Ramadan was curtailed by Cooke's action. (PFOF ¶ 18; McKenzie Aff., Ex. B, Zoschke Dep., 16:1-16; 59:21-23; 84:1-4.) Earle was KMCI's assistant warden for programs. KMCI's religious services were among the prison programs falling under her purview. As a result, Earle was Zoschke's supervisor. (PFOF ¶ 19; McKenzie Aff., Ex. B, Zoschke Dep., 16:1-16; 59:21-23; 84:1-4.) Conyers followed the proper grievance procedure of filing an inmate complaint, receiving a decision from the warden, having an adverse decision reviewed by a the corrections complaint examiner, and receiving a decision from the Secretary of the DOC. All of these steps of review were adverse to Conyers. (PFOF ¶ 20; Hallet Aff. of 6/9/03, at ¶¶ 1-7).

While incarcerated at KMCI, Conyers participated in Ramadan in 1995 and attended weekly Ju'mah services on a regular basis. (PFOF ¶ 12; McKenzie Aff., Ex. A, Conyers Dep., 11:12-12:3.) To participate in the Fast of Ramadan that started in February 1995, all inmates housed in general population and segregation had to sign-up prior to the deadline on or about January 27, 1995. (DFOF ¶ 28; Zoschke Aff. of 7/6/07, at ¶ 27.) In 1995, while at Friday Ju'mah services, Zoschke told

---

[7] Defendants dispute proposed finding of fact 11 to the extent that it implies that the plaintiff could not have obtained the start date for the 1996 Fast of Ramadan at KMCI or implies that the defendants were required to inform him of either the start date or the sign-up deadline because the evidentiary material cited does not support such implications.

7

Conyers to write his name on a list. Zoschke never explained to Conyers that failing to sign his name to the list by a certain date would result in the denial of his ability to participate in Ramadan. (PFOF ¶ 7; McKenzie Aff., Ex. A, Conyers Dep., 13:25-14:11; 18: 20-20:6.)

While Zoschke was at KMCI, Barbara Earle was never a member of the staff of Unit 14. (DFOF ¶ 42; Zoschke Aff. of 7/6/07, at ¶ 39.) Neither Zoschke nor Hafermann worked in food service at KMCI; Zoschke was the chaplain and Hafermann was a security officer. Additionally, neither man states his job at KMCI had anything to do with ordering meal ingredients or any other food service function. (PFOF ¶ 9; Zoschke Aff. of 7/6/07, at ¶ 3; Hafermann Aff. of 7/9/07, at ¶¶ 2-3.)

**ANALYSIS**

The defendants contend that: 1) since the sign-up deadline for the 1996 Fast of Ramadan applied to Conyers, and he should have been aware of the deadline, and there was a legitimate penological interest in enforcing the deadline, the defendants did not violate his First Amendment rights; 2) since the issue raised in Conyers' inmate complaint is not an issue on which he can proceed against defendants Cooke and Earle, he has failed to exhaust his administrative remedies with respect to them; 3) since it was not clearly established, based on the facts confronting Zoschke at the time, that his denial of Conyers' request to participate in the Fast of Ramadan would violate his First Amendment rights, Zoschke would be entitled to qualified immunity in any event.

In response, Conyers first contends that KMCI fails to demonstrate a legitimate penological interest in refusing to provide him with a bagged meal. Specifically, Conyers asserts that: 1) the imposition of a deadline that was not communicated to him fails to support a legitimate penological interest; 2) providing him with a bagged meal would not have impacted prison security; 3) providing him with a bagged meal would not have impacted prison food service concerns; 4) refusing to provide him with a bagged meal did not advance the goal of prisoner rehabilitation; and

8

5) allowing inmates who transferred to KMCI after the sign-up deadline to participate in the observance of Ramadan reveals the illegitimacy of the prison's alleged penological interests. Conyers further contends that Zoschke is not entitled to qualified immunity because Zoschke violated a clearly established constitutional right and because he had a ministerial duty to promote religious activity. Finally, Conyers contends that he did exhaust his administrative remedies as to defendants Cooke and Earle.

As a prisoner, Conyers retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the correctional system. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Encompassed within the First Amendment is the right of free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992); *Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005).

A prisoner is entitled to practice his or her religion as long as doing so does not unduly burden the institution. *Richards*, 957 F.2d at 474. A prison regulation that infringes upon an inmate's First Amendment rights is valid only "if it is reasonably related to legitimate penological interests." *Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir. 1994) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). In balancing the two interests, several factors are relevant: 1) whether there is a legitimate governmental interest underlying the prison officials' actions; 2) whether the prisoner retains alternative ways of exercising the right in question; and 3) the impact accommodation of the asserted constitutional right would have on guards, other inmates, and on the allocation of prison resources. *Richards*, 957 F.2d at 471 (citing *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991)).

Denying an inmate the opportunity to participate in the Fast of Ramadan impinges his constitutional right to freely exercise his religion. The Seventh Circuit has held, in the context of Muslim inmates who were denied pork-free meals while confined in disciplinary segregation, that

9

prison officials must demonstrate a legitimate penological objective for decisions that impede religious exercise. *Conyers v. Abitz*, 416 F.3d 580, 586 (7th Cir. 2005) (citing *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990)). Indeed, courts have generally held that to deny prison inmates the provision of food that satisfies the dictates of their faith unconstitutionally burdens their free exercise rights. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004) (noting that this principle was established in the Second Circuit in 1975); *see also Makin v. Colo. Dep't of Corrs.*, 183 F.3d 1205 (10th Cir. 1999) (holding that prison officials' failure to accommodate inmate's meal requirements during Ramadan violated his free exercise rights); *DeHart v. Horn*, 227 F.3d 47 (3d Cir. 2000) (en banc) (finding that Buddhist plaintiff whose request for a vegetarian diet was denied because vegetarianism was not an absolute requirement of Buddhism had stated a free exercise claim, and remanding for further factual findings regarding the existence of countervailing penological interests); *Love v. Reed*, 216 F.3d 682 (8th Cir. 2000) (holding that denial of inmate's request for bread and peanut butter so that he could prepare his Sunday meals in his cell on Saturday-thereby avoiding preparing food, or benefitting from the preparation of food by others, on the Sabbath-violated prisoner's free exercise rights); *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997) (holding that prison's policy of supplying Orthodox Jewish inmates with one frozen kosher dinner supplemented with nonkosher vegetarian or nonpork meals violated prisoners' free exercise rights).

The following is undisputed. Conyers asked to be provided with late bagged dinners during the Fast of Ramadan on January 20, 1996. On January 22, 1996, Zoschke informed Conyers the due date for signing up for the Fast of Ramadan was January 17, 1996. Conyers was not allowed to participate in the Fast of Ramadan at KMCI in 1996 in that he was not provided with late bagged dinners during Ramadan.

The defendants assert that the Fast of Ramadan sign-up deadline applied to Conyers, he should have been aware of the deadline, and the deadline was reasonably related to the legitimate penological interest of rehabilitation. Although they acknowledge that Conyers disagrees with these assertions, the defendants maintain that the evidentiary materials cited by Conyers do not support his claim that a dispute exists. The court turns to the parties' disagreements to discern whether a genuine issue of material fact exists.

**1. Whether the sign-up deadline applied to Conyers**

According to the defendants, pursuant to KMCI Policy and Procedure Number 875-5.DOC, Religious Services, inmates were responsible for submitting requests to participate in special religious services by interview request or personal conversation with the chaplain and to follow the rules of participation. (DFOF ¶ 12; Zoschke Aff. of 7/6/07 at ¶ 11; Hafermann Aff. of 7/9/07, at ¶ 5.) Following the rules of participation in January 1996 included requesting to participate in a timely manner by meeting the deadline to sign-up. (Zoschke Aff. of 7/6/07, at ¶ 12; Hafermann Aff. of 7/9/07 at ¶ 6.) The deadline to sign-up to participate in the Fast of Ramadan in 1996 applied to inmates in both general population and the Adjustment Center. (DFOF ¶ 16; Zoschke Aff. of 7/6/07, at ¶ 15; Hafermann Aff. of 7/9/07, at ¶ 7.)

According to Conyers, Zoschke had a duty under the same policy to promote and inform the inmates of all services and activities. (Zoschke Aff. of 7/6/07, at ¶ 3.) Moreover, the defendants do not and cannot cite to any KMCI rule, policy, or procedure to support the contention that in January 1996 an inmate confined in the Adjustment Center, such as Conyers, was required to request to participate in special religious services in a timely manner by meeting the deadline to sign-up. Zoschke concedes that sign-up deadline notices of the 1996 Fast of Ramadan did not apply to inmates in segregation and, hence, Conyers. Zoschke states, under oath, that: "it was standard practice

11

for me to draft a notice in the daily bulletin, which was distributed to all inmates housed in general population, indicating the deadline for signing up to participate in the Fast of Ramadan. In addition, I would make an announcement at the Friday prayer service that inmates interested in participating in the Fast of Ramadan should sign-up by the deadline date. Inmates in segregation were aware that bulletins were not posted in the Adjustment Center." (Zoschke Aff. of 5/9/06, at ¶ 17.) Finally, Conyers asserts that under Wisconsin law in effect in January 1996, the only way the daily bulletin notice concerning the deadline to sign-up to participate in the Fast of Ramadan could have "applied to inmates in…Adjustment Center" was "if the inmate had actual knowledge of the contents of the bulletin and that it was still in force," or if the chaplain had informed the inmates in segregation about the upcoming Fast and the rules of participation on that religious event. (*See* Response to DPFF, ¶ 13; Wis. Admin. Code § DOC 303.08(1); KMCI 875-5.DOC(B)(2) & (D)(7); and Def. Resp. to Pl.'s First Req. for Admiss. No. 7 (docket no. 93); also see Wis. Admin. Code § DOC 309.61(2)(g)).

**2. Whether Conyers should have been aware of the sign-up deadline**

According to the defendants, inmates at KMCI were expected to know when their religious observances begin and end; staff was not responsible for ensuring that every inmate was aware of the dates of particular religious holidays that they may wish to observe. (DFOF ¶ 23; Zoschke Aff. of 7/6/07, at ¶ 22; Hafermann Aff. of 7/9/07, at ¶ 9.) Inmates in segregation could find out about a deadline by asking the unit staff, asking the program director who made regular rounds on the segregation unit, asking the chaplain who also made regular rounds on the segregation unit, asking other inmates on the unit, writing to the program director, writing to the chaplain, or by writing to other KMCI staff who might have information about the deadline. (DFOF ¶ 36; Hafermann Aff. of 7/9/07, at ¶ 17.) Consequently, there can be no doubt that Conyers should have known that the sign-up deadline for the 1996 Fast of Ramadan would be about January 16, 1996, give or take one or

12

two days at the most in either direction, and would never have been as late as "on or about January 20, 1996" which is when Conyers "sent defendant Zoschke an interview request slip asking him to put me on the list for the 1996 Fast of Ramadan … ." (DFOF ¶ 50; Conyers Aff. of 9/2/03, at ¶ 16.)

According to Conyers, Zoschke, as part of his employment, was required to inform and promote all religious events. (Zoschke Aff. of 7/6/07, Ex. C). Prisoners could not know what days the prison observance of Ramadan would commence as the prison's observance did not always start the same day as the general public's observance. (McKenzie Aff., Ex. B, Zoschke Dep. 41:24 –42:17; Conyers Aff. of 2/21/06, at ¶¶ 21-23; McKenzie Aff., Ex. A, Conyers Dep. at 20. While in segregation, Conyers' only responsibility in participating in the Fast of Ramadan was to request to participate by way of written interview request to defendant Zoschke, which he did since Zoschke never made cell front rounds nor promoted or personally informed Conyers of the Fast of Ramadan as Zoschke was required to do, pursuant to KMCI Policies and Procedure No. 875-5.DOC(B)(1) and (D)(7). (*See* 2/21/06 Conyers Aff., ¶¶ 6-11, 22-23.)

**3. Whether the deadline was reasonably related to a legitimate penological interest**

According to the defendants, inmates at KMCI in 1996 were, as part of their ongoing rehabilitation, expected to take the initiative to find out about deadlines regardless of whether they were in general population or segregation. (DFOF ¶ 19; Zoschke Aff. of 7/6/07, at ¶ 18; Hafermann Aff. of 7/9/07, at ¶ 18.) All inmates housed in both general population and the Adjustment Center were required to sign-up for activities such as the 1996 Fast of Ramadan by the deadline so that institution staff would have time to properly prepare for that activity by ensuring that an appropriate number of staff was on hand to control the unit and the institution. This was necessary also to meet the needs of the inmates in each unit and make sure the correct number of supplies were available to ensure that all inmates who wished to participate could do so. (DFOF ¶ 20; Zoschke Aff. of 7/6/07,

13

at ¶ 19; Hafermann Aff. of 7/9/07, at ¶ 11.) Also, if one inmate were allowed to participate in the 1996 Fast of Ramadan without meeting the deadline then other inmates would think that they should also be exempt from having to do so which could create a threat to security. (DFOF ¶ 21; Zoschke Aff. of 7/6/07, at ¶ 20; Hafermann Aff. of 7/9/07, at ¶ 13.) KMCI also had a rehabilitative interest in setting a deadline to request to participate in the 1996 Fast of Ramadan and other activities. By setting a deadline to sign up for services and activities inmates were being taught that they were not above the rules and that when they follow the rules, policies and procedures of the institution, they were allowed to participate in the events and activities that they chose. (Zoschke Aff. of 7/6/07, at ¶ 21; Hafermann Aff. of 7/9/04, at ¶ 14.) The deadline to sign-up for the 1996 Fast of Ramadan was also necessary because there was an additional workload for Food Service staff. They needed enough time to coordinate the number of inmates participating with amount of supplies needed to accommodate the needs of those participating in the Fast, acquire the proper supplies and food for the number of inmates participating, and prepare the correct amount of meals separate from the regular meal service needed for the inmates placed on the list. (DFOF ¶ 31; Zoschke Aff. of 7/6/07, at ¶ 30; Hafermann Aff. of 7/9/07, at ¶ 15.) Security staff needed to know how many inmates were participating in the Fast of Ramadan in advance of the start of the Fast, and on what units so that they could properly make arrangements for the fast. Security staff needed to notify unit staff of the inmates approved to participate to ensure that each shift would have knowledge of which inmates were to be served separate from the regular meal service. Security staff also needed to schedule staff accordingly to ensure that there would be enough staff on the units to control the units and institution and to properly ensure the safety of the inmates, staff and the institution. (DFOF ¶ 32; Zoschke Aff. of 7/6/07, at ¶ 31; Hafermann Aff. of 7/9/07, at ¶ 11.) Unit staff needed to know who was participating in the Fast of Ramadan in advance so they could ensure the safety of the inmates, staff and the security

14

of the institution and to also meet the needs of the inmates participating such as meal delivery. (DFOF ¶ 33; Zoschke Aff. of 7/6/07, at ¶ 32; Hafermann Aff. of 7/9/07, at ¶ 12.) Inmates who requested to participate in the Fast of Ramadan after the sign-up date deadline had passed were not allowed to participate due to needs of the food service staff, security staff and unit staff. (DFOF ¶ 34; Zoschke Aff. of 7/6/07, at ¶ 33.) Inmates who requested to participate in activities after the sign-up date deadline had passed were not allowed to participate due to needs of the institution staff, the rehabilitative needs of the inmates and the security needs of the institution. (DFOF ¶ 35; Hafermann Aff. of 7/9/07, at ¶ 16.)

**4. Discussion**

As this court stated in its previous Decision and Order considering the defendants' motion for summary judgment and Conyers' cross-motion for summary judgment,

> Whether the sign-up deadline applied to inmates who were in segregation is a genuine issue of material fact because a reasonably jury could decide that the sign-up deadline did not apply to segregation inmates. If the sign-up deadline did not apply to segregated inmates, then, regardless of whether the deadline is reasonably related to legitimate penological objectives, the defendants would have no reason for denying Conyers' participation in the Ramadan fast while he was in segregation.

(Court's Order of October 27, 2006, at 22.) Additionally, assuming that the sign-up deadline applied to inmates in segregation, there is a genuine is of material fact concerning whether Conyers should have been aware of the sign-up deadline. Finally, many of the defendants' penological interests for enforcing the deadline and not allowing Conyers to participate turn on the above-stated disputes.

The defendants also contend that they are entitled to qualified immunity. Government officials performing discretionary functions are immune from suit if "their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Borello v. Allison*, 446

15

F.3d 742, 746 (7th Cir. 2006) (citations omitted). In evaluating a claim of qualified immunity, courts conduct a two-step inquiry: "First the court must determine whether the disputed conduct, as alleged, violates a constitutional right; second, the court must determine whether that right was 'clearly established' at the time of the alleged conduct." *Id.* (quoting *Wernsing v. Thompson*, 423 F.3d 732, 742 (7th Cir. 2005)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).

> As the Seventh Circuit stated with regard to this very question:
>
> The relevant inquiry is whether, at the time the defendants refused Conyers's request, the law was clearly established that prison officials must have a legitimate penological interest before imposing a substantial burden on the free exercise of an inmate's religion, even when that inmate is in disciplinary segregation. We have held, in the specific context of Muslim inmates who were denied pork-free meals while confined in disciplinary segregation, that prison officials must demonstrate a legitimate penological objective for decisions that impede religious exercise. *Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990); *see also McEachin v. McGinnis*, 357 F.3d 197, 204 (2d Cir. 2003) (free exercise is violated when generally applicable prison policies fail to accommodate segregated inmate's religious dietary requirements).

*Conyers*, 416 F.3d at 586. Accordingly, the defendants' are not entitled to qualified immunity.

**5. Exhaustion**

The Prison Litigation Reform Act of 1995 (PLRA), Pub.L. 104-134, 110 Stat. 1321 (1996), provides in pertinent part that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wis. Dep't of Corrs.*, 182 F.3d 532, 535 (7th Cir. 1999)). Section 1997e applies to "all inmate suits, whether they involve general

16

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA exhaustion requirement requires "proper exhaustion," meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines. *Woodford v. Ngo*, 126 S.Ct. 2378, 2384, 2387 (2006); *see also Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require"). Exhaustion is an affirmative defense, and the burden of proof is on the defendants. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004)).

A purpose of the exhaustion requirement is to allow prison officials time and opportunity to respond to complaints internally before an inmate initiates litigation. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *see also Smith v. Zachary*, 255 F.3d 446, 450-51 (7th Cir. 2001). To provide officials with sufficient notice, inmates must file grievances at the place and time and with the information required by the prison's administrative rules. *Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002). Where the administrative rules are silent, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Id.* at 650; *see Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

It is undisputed that on July 22, 1996, Conyers filed a prison grievance, complaining that because he did not have access to the daily bulletin in segregation and thus was unaware of the sign-up deadline, he had been denied the ability to participate in the Fast of Ramadan.

The defendants contend that Conyers failed to exhaust his administrative remedies against defendants Cooke and Earle. According to the defendants, Conyers failed to exhaust his claim that Cooke failed to overrule Zoschke's decision that Conyers could not participate in the Fast of

17

Ramadan. They also contend that Conyers did not exhaust administrative remedies against defendant Earle because Conyers did not identify her by name or describe her misconduct in his inmate complaints and subsequent appeals.

However, the PLRA does not require that a defendant be named in an inmate's administrative grievance. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007). Prison grievance procedures, not the PLRA, determine the level of specificity required in an inmate's administrative grievance:

> Compliance with the prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Id.* Drawing on principles of notice pleading, the Court of Appeals for the Seventh Circuit has held that, absent more stringent administrative requirements, an inmate need not state "facts, legal theories, or demand relief," so long as the grievance objects "intelligibly to some asserted shortcoming." *Strong*, 297 F.3d at 650; *see Riccardo*, 375 F.3d at 524.

In this case, Conyers fully exhausted an inmate complaint in which he complained about not being allowed to participate in the 1996 Fast of Ramadan at KMCI. Conyers is proceeding on a claim against the three named defendants based on those allegations. Based on the relevant case law, the defendants' motion for summary judgment for failure to exhaust administrative remedies will be denied.

## ADDITIONAL MATTER

Based on recent filings in this case, both the plaintiff and the defendants assert that the only remaining defendants in this case are Marianne Cooke, Barbara Earle, and Paul Zoschke. However, the case docket indicates that Tom Abitz, Keith Hellwig, Lora Hallet, Thomas J. Nickel,

18

Charles Miller, Ave M. Bie, and Michael J. Sullivan are also defendants. For the most part, the latter defendants appear to have been involved in claims upon which Conyers is no longer proceeding. In any event, they have not been dismissed from this action. If the parties stipulate to the dismissal of Tom Abitz, Keith Hellwig, Lora Hallet, Thomas J. Nickel, Charles Miller, Ave M. Bie, and Michael J. Sullivan, they should so notify the court.

## **ORDER**

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #126) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2007.

**SO ORDERED:**

**s/Rudolph T. Randa**
**HON. RUDOLPH T. RANDA**
**Chief Judge**